1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| TREEMO, INC., a Washington corporation, | NO.  C13-1218-JPD |
| Plaintiff, | MEMORANDUM OPINION |
| v. | |
| FLIPBOARD, INC., a California corporation, | |
| Defendant. | |
| FLIPBOARD, INC., a California corporation, | |
| Counter-Claimant, | |
| v. | |
| TREEMO, INC., a Washington corporation, | |
| Counterclaim-Defendant. | |

## I.    INTRODUCTION

This matter was tried to the Court, sitting without a jury, on September 22, 23 and 29, 2014.  Plaintiff and counterclaim-defendant Treemo, Inc. (hereinafter referred to as "Treemo"

or "defendant") is seeking a declaration that its "FLOWBOARD" mark and "F" logo (collectively, the "FLOWBOARD marks") do not infringe the "FLIPBOARD" mark and "F" logo (collectively, the "FLIPBOARD marks") owned by defendant and counter-claimant Flipboard, Inc. (hereinafter referred to as "Flipboard" or "plaintiff") under the Declaratory Judgments Act, 28 U.S.C §§ 2201 and 2202, and the Lanham Act, 15 U.S.C. § 1125 (a) and (c).[1]  Dkt. 1.  Flipboard alleges statutory and common law infringement of trademark rights and false designation of origin and unfair competition under 15 U.S.C. §§ 1114 and 1125(a). Flipboard asks the Court to permanently enjoin Treemo and/or its agents from using the FLOWBOARD marks, and to order the United States Patent and Trademark Office ("USPTO") to invalidate any trademarks registered to Treemo.  Dkt. 6.  The Court has now considered the evidence presented at trial, the exhibits admitted into evidence, the parties' briefs, and the arguments of counsel.  This memorandum opinion will constitute the Court's Findings of Fact and Conclusions of Law.

## II.     JURISDICTION

Both parties have consented to proceed before the undersigned under 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, and Local MJR 13.  Dkt. 16.  The Court has original jurisdiction under 15 U.S.C. § 1121 (claims arising under the Lanham Act) and 28 U.S.C. § 1331, 1332, and 1338.  Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) because a substantial portion of the events giving rise to this action occurred within this district.

---

[1] In light of the fact that this action concerns alleged trademark infringement by Treemo, the Court directed the parties to refer to Treemo, Inc. as "defendant" throughout the trial of this matter and Flipboard, Inc. as "plaintiff." The Court will refer to the parties in the same manner throughout this memorandum opinion.

### III.     BACKGROUND

A.     Flipboard and its FLIPBOARD Marks

Founded in 2010 by Michael McCue and Evan Doll, Flipboard is a technology company based in Palo Alto, California.  Dkt. 84 at 2 ("Admitted and Undisputed Facts" in the Joint Pre-Trial Order).  Marci McCue, Flipboard's head of marketing and one of its founding members, testified that Flipboard currently has approximately 160 employees.  Flipboard launched its eponymous product in July 2010, which is a software application ("app") for smartphones and tablet computers (hereinafter the "Flipboard app") available in the United States as well as in a variety of foreign countries.  The Flipboard app is available for free and can be downloaded to most mobile devices within one minute from online channels such as Apple's App Store for iPhones and iPads or Google's Play Store for Android devices.  *Id*.  The Flipboard app is also available for use on Blackberry devices, Windows phones and tablets, Amazon's Kindle, and Barnes and Noble's NOOK device.  *Id.*

The original version of the Flipboard app, or "Flipboard 1.0," provided a means for collecting content that others had posted to the Internet, such as the news of the day.  As a result, the Flipboard app gained a reputation as a news aggregator or a news reader.  The Flipboard app was immediately successful, as it was named Apple's iPad App of the Year in 2010 and one of Time's Top 50 Inventions of 2010.  Since 2010, Flipboard has also won awards around design, innovation on the Android, and several Webby awards.

The FLIPBOARD mark was selected in order to describe the motion of the product and reflect the unique way users experience the app, as they "flip" between pages using touchscreen gestures.  Flipboard's "F" logo is described in its trademark registration "a red square containing a stylized letter 'F', which is composed of a white vertical rectangle, with a

pink bar creating the upper bar of the letter 'F', and with a pink square below it, creating the middle bar of the letter 'F'." Ex. 523. Thus, Flipboard's "F" logo has a stairstep design, and the pink horizontal bars give the logo the appearance of translucency. Flipboard's head of design testified that the "F" logo was selected to distinguish the logo from many other startups' rounded or "bubble art-ish" logos. The FLIPBOARD marks have been used in commerce since July 20, 2010, and appear throughout the Flipboard app as well as in the URL of Flipboard's website, the account name for Flipboard's official Facebook account, the "handle" for Flipboard's official Twitter account, and Flipboard's marketing material.

Flipboard applied to register its FLIPBOARD mark with the USPTO in February of 2010, and its "F" logo mark in December of 2010. The USPTO granted registration of the FLIPBOARD mark, separately, on July 24, 2012 as to certain goods and services in International Classes 9, 41, and 45, and on August 27, 2013, as to certain services in International Class 35. *See* Exs. 72, 73, 75, 76. Flipboard has also applied for and received registration for the FLIPBOARD marks in International classes 35 and 42. *See* Exs. 74, 77. The USPTO granted registration for the "F" logo mark as to certain goods and services in International Classes 9, 41, and 45, on July 31, 2012, and in International Class 35 on August 20, 2013. *See* Exs. 75-76.

On March 26, 2013, Flipboard released an updated iteration of its app, referred to during the trial as "Flipboard 2.0." Flipboard 2.0 substantially expanded the functionality of the product by allowing users to create personal and interactive publications called "magazines." Users create these magazines by combining online content from various Internet sources in order to tell stories, create an online photo album, or display social media content. *See* Ex. 115 (Ms. McCue's personal magazine entitled, "Africa trip"); Ex. 100 (Mossberg

YouTube video demonstrating Flipboard 2.0's functions). Users can then publish and share their magazines with others across social networks, or via e-mail and website posts.

The launch of Flipboard 2.0 in March 2013 was the first big release since Flipboard's original launch. Flipboard conducted a large public relations campaign to advertise the app's new features, including press tours, e-mail campaigns, and overhauling the website. The consistent theme in those marketing efforts was to explain how Flipboard 2.0 was expanding the user's capability to collect and create their own content. Flipboard continues to devote substantial time and resources to marketing the Flipboard 2.0 app and building brand awareness through social network channels such as Facebook and Twitter, Flipboard's website, weekly blog posts, news articles and online publications. Flipboard spends approximately $3-4 million annually to market its app.

Ms. McCue testified that thousands of user-created magazines are shared by Flipboard users every day.[2] For example, universities have created magazines that function like a brochure, displaying news about happenings on campus, videos, and photographs. *See* Ex. 111 ("Rice University Official Flipboard"). Business associations have created industry presentations or publications to help people who are in a common business stay "current" or connected on a particular topic. *See* Ex. 112 ("Mobile Trucking Magazine: Trucking Industry News & Information for Drivers"). The Flipboard app can be used to create a portfolio to organize and display a user's work product that has been posted elsewhere on the internet. *See* Ex. 113 (journalist's writing portfolio); Ex. 114 (user's art and design portfolio).

---

[2] Specifically, Ms. McCue testified that there are 10 to 12 million different magazines or collections on Flipboard, and five to seven million users have created at least one magazine.

MEMORANDUM OPINION - 5

One limitation of Flipboard 2.0 is that the content added to each magazine must have already been uploaded to another online service.  Specifically, Flipboard 2.0's current editor tools allow a user to adjust layouts, change the cover of the magazine, and add some written comments, but a user cannot upload original content directly off a phone or tablet right into the Flipboard app.  Instead, it must first be posted on the web elsewhere, such as a Facebook account.  However, Ms. McCue and Flipboard's General Counsel Cecily Mak testified that Flipboard will be releasing a new iteration of its app ("Flipboard 3.0") with a more expansive tool set in the next 60 to 90 days that will allow users to add original content right into the Flipboard app, as opposed to posting it somewhere else on the Internet first.

B.    Treemo and its FLOWBOARD Marks

Founded in October 2005 by Chief Executive Officer Brent Brookler, Treemo is a small technology company based in Seattle, Washington.[3]  Since its founding, Treemo has been in the business of developing and marketing mobile applications.  Between 2009 and 2011, Treemo was primarily producing and distributing a "family" of software products for mobile devices with names like "Appazine," "Appavideo," and "Appafolio."  Mr. Brookler testified that he first heard about the Flipboard app shortly after its initial launch in July 2010, and was therefore familiar with Flipboard several years before he launched the Flowboard app.

The Appafolio product, which was the primary product that Treemo was promoting in 2011, was a platform for a user to bring together into a "folio" the user's personally-generated multimedia content, such as graphics, imagines, or other user-created content.  Mr. Brookler testified that while developing Appafolio, which required an interaction between the Internet

---

[3] The parties' Joint Pretrial Order provides that Treemo had 8 employees at the time of trial.  Dkt. 84 at 5. Based upon Mr. Brookler's testimony, it appears that Treemo had as many as 14 employees when the Flowboard app was being developed.

and a tablet device, his development team realized they were actually building presentation software and the rise of the iPad presented an opportunity to reinvent such software.

In January 2012, Treemo began devoting substantial resources to developing a "next generation" presentation software product that would allow anyone to author interactive presentations from their tablet, and specifically the iPad tablet. According to Treemo, the product would allow the user to build a storyboard-style presentation with interactive links to enable the viewer to arbitrarily follow various paths in the presentation, as in a flowchart. Thus, a user would navigate Treemo's application by scrolling or "flowing" from screen to screen. Although this was the genesis of the Flowboard app, Treemo initially called this new product Appasplook.

Treemo filed an application with the USPTO for the Appafolio trademark in October 2011. However, in April 2012, that application was opposed by a company called AppFolio. In October 2012, AppFolio filed a lawsuit against Treemo in the Central District of California asserting claims for, *inter alia*, trademark infringement and cybersquatting. On April 8, 2013, Treemo and AppFolio entered into a settlement agreement under which Treemo agreed to cease its use of the Appafolio mark and withdraw its trademark application. *See* Ex. 23. Mr. Brookler testified that because of Treemo's problems with the Appafolio name, Treemo began to consider rebranding its Appasplook product as Flowboard around June or July of 2012.

Mr. Brookler testified that the name "Flowboard" originated from his engineers referring to a main screen in the app, which functions as a table of contents with links that allow a user to slide back and forth between various screens in the presentation, as the "flow

screen" and eventually the "flow board."[4]  Mr. Brookler testified that when he initially

researched the name "Flowboard," he also stumbled upon an article that referred to a

"Flowboard" as the "mixing up of storyboard with flowchart."  This description resonated with

Mr. Brookler as being reflective of the user's experience using the app.  Mr. Brookler also

personally conducted a search on the USPTO website, and concluded that the trademark for

FLOWBOARD appeared to be available.  *See e.g.*, Ex. 508.  Mr. Brookler testified that he

ultimately selected the FLOWBOARD mark following a series of meetings with his team.

   On August 9, 2012, Treemo filed an application expressing its intent to use the

FLOWBOARD mark with the USPTO.  On December 6, 2012, Treemo received a notice from

the USPTO, advising Treemo that the trademark examining attorney had searched the

USPTO's database of registered and pending marks and determined that no conflicts would bar

registration of that mark.  *See* Ex. 502.  The public opposition period also closed without

objection.

   In addition to the FLOWBOARD mark, Treemo also adopted its own "F" logo with the

help of digital and social media agency Carrot Creative.  Treemo retained Carrot Creative to

consult on logo and web design in early 2013.  *See* Dkt. 84 at 5.  Treemo considered many

different options for an "F" logo in different fonts, colors, and designs before settling on the

current version.  *See* Exs. 79-81, 86, 98.

   The Flowboard app officially launched on April 18, 2013.  The Flowboard app is not as

widely available as the Flipboard app, and is in fact exclusively available for the iPad tablet

device through the Apple App Store.  Treemo uses its FLOWBOARD marks in essentially the

---

[4] Treemo refers to what would typically be considered "slides" in a presentation as "screens," to reflect their interactive nature.

same way as Flipboard.  Specifically, Treemo uses the FLOWBOARD marks throughout the app itself, as the URL of its official website, in the account name for Flowboard's official Facebook account, as the "handle" for the Flowboard's official Twitter account, and throughout Treemo's marketing materials.

Unlike Flipboard, Treemo began offering a "premium" version of the Flowboard app for Macs that consumers had to pay to download from the Apple app store on July 10, 2014.  Mr. Brookler estimated that there have been approximately 6,000 downloads of the premium version of the app, and approximately 300,000 downloads of the free version of the app for the iPad.

The FLOWBOARD mark registration was issued to Treemo by the USPTO on August 19, 2014.  *See* Ex. 502.  The Flowboard app has also received awards, including the Tabby Award for best "personal productivity" app in August 2014.  *See* Ex. 519.

C.     Procedural History

Flipboard's employees, including Ms. McCue and Ms. Mak, first learned about the Flowboard app on April 19, 2013, the day after Treemo launched the application.  On April 22, 2013, Flipboard's outside counsel sent a letter on behalf of Flipboard to Treemo demanding that Treemo cease use of the FLOWBOARD marks or Flipboard would "assert its superior rights."  *See* Ex. 20.  Treemo declined to discontinue its use of the FLOWBOARD marks via letter to Flipboard's outside counsel dated May 6, 2013.  *See* Ex. 21.  On May 17, 2013, Flipboard reiterated its position that the parties' marks are confusingly similar, and encouraged Flowboard to cease the use of its marks.  *See* Ex. 22.

On July 11, 2013, Treemo filed the current lawsuit seeking a declaratory judgment of non-infringement.  Dkt. 1.  On July 26, 2013, Flipboard counterclaimed for statutory and

common law trademark infringement, and for false designation of origin under the Lanham Act, and seeks only injunctive relief.  Dkt. 6.

IV.     DISCUSSION

A.     Elements of a Trademark Infringement Claim

The Lanham Act prohibits the "use[ ] in commerce [of] any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin" that "is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods."  15 U.S.C. § 1125(a)(1)(A).  To establish trademark infringement under the Lanham Act, a plaintiff must demonstrate that (1) it has a valid, protectable ownership interest in a mark, (2) its mark is the senior mark, and (3) the defendant's mark is likely to cause consumer confusion in the marketplace.  *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1202-03 (9th Cir. 2012); *see also Brookfield Comm'ns, Inc. v. West Coast Ent. Corp*., 174 F.3d 1036, 1046-47 (9th Cir. 1999).

Here, there is no dispute that Flipboard has a valid, protectable ownership interest in the FLIPBOARD marks, and that the FLIPBOARD marks are senior to the FLOWBOARD marks.  Flipboard's trademark registration is prima facie evidence of the validity of its marks.  15 U.S.C. § 1057(b).  Thus, the resolution of this case revolves around whether the FLOWBOARD marks are likely to cause consumer confusion in the marketplace.  *See Masters Software, Inc. v. Discovery Commc'ns, Inc.*, 725 F. Supp. 2d 1294, 1299 (W.D. Wash. 2010) (noting that in any trademark infringement action, "likelihood of confusion is the touchstone.").  Specifically, the question is whether consumers are likely to mistakenly believe that Flowboard's app is "somehow affiliated with or sponsored by" Flipboard.  *Cohn v.*

*Petsmart, Inc.*, 281 F.3d 837, 841 (9th Cir. 2002); *Dreamwerks Prod. Group, Inc. v. SKG Studio*, 142 F.3d 1127, 1130 (9th Cir. 1998).

In answering this question, the Court takes guidance from the eight factors articulated by the Ninth Circuit in *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979). These "*Sleekcraft* factors" include: (1) the strength of the allegedly infringed mark; (2) the similarity of the parties' goods; (3) the similarity of the parties' marks; (4) the extent to which there is evidence of actual confusion; (5) the marketing channels used by the parties; (6) the degree of care likely to be exercised by the purchasers of the parties' products; (7) the alleged infringer's intent in selecting its marks; and (8) the likelihood that the alleged infringer will expand its product lines.

The Ninth Circuit has consistently held that courts' application of the eight *Sleekcraft* factors in determining the likelihood of confusion is supposed to be "pliant," and has warned against "excessive rigidity" in applying the factors. *Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 632 (9th Cir. 2008). Rather, "[t]he test is a fluid one and the plaintiff need not satisfy every factor, provided that strong showings are made with respect to some of them." *Surfvivor Media, Inc. v. Survivor Productions*, 406 F.3d 625, 631 (9th Cir. 2005). *See also Dreamwerks*, 142 F.3d at 1129-32 (allowing case to proceed past summary judgment where the plaintiff overwhelmingly satisfied three *Sleekcraft* factors). Courts have extensive discretion in determining how much weight to accord each factor based on the circumstances of the case. The Court will analyze each of the eight *Sleekcraft* factors below.

B.     Treemo's Use of the FLOWBOARD Mark is Likely to Cause
       Consumer Confusion

As will be discussed in more detail below, after considering each *Sleekcraft* factor and balancing them as a whole, the Court finds that the balance of the *Sleekcraft* factors weigh substantially in favor of Flipboard.  As a result, the Court finds that Treemo's use of the FLOWBOARD mark in association with its Flowboard app is causing consumer confusion between its product and the Flipboard app, and this confusion is likely to continue.  The Court does not, however, find that Flowboard's use of its "F" logo is likely to cause confusion.

1.     Strength of the FLIPBOARD Mark

The purpose of examining the strength of the plaintiff's mark is to determine the scope of trademark protection to which the mark is entitled.  *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1141 (9th Cir. 2002).  In examining the strength of the mark, the strength of the senior mark determines the scope of trademark protection to which it is entitled, while the strength of the junior mark determines whether it is so strong as to overtake the senior mark. *Surfvivor Media, Inc.*, 406 F.3d at 631 n.3.  Strength is a function of both inherent qualities of the mark and acquired or commercial qualities of the mark.  *Playmakers, LLC v. ESPN, Inc.*, 297 F. Supp. 2d 1277, 1281 (W.D. Wash. 2003).

Trademarks are divided into five categories.  The two strongest sets of marks are "arbitrary" and "fanciful" marks, which trigger the highest degree of trademark protection. *Entrepreneur Media*, 279 F.3d at 1141.[5]  The third category, "suggestive" marks, do not "describe the product's features but suggest [ ] them."  *Kendall-Jackson Winery v. E. & J.*

---

[5] "Arbitrary" marks are common words that have no connection with the actual product—for example, "Dutch Boy" paint.  *See Dreamwerks*, 142 F.3d at 1130 n.7.  "Fanciful" marks consist of "coined phrases" that also have no commonly known connection with the product at hand.  *Id.*  Examples of fanciful marks include "Kodak" cameras or "Aveda" skin care products.  *Id.*

*Gallo Winery*, 150 F.3d 1042, 1047 n.8 (9th Cir. 1998) (emphasis omitted).  Examples include "Slickcraft" boats or "Air Care," for a service that maintains medical equipment for administering oxygen.  *Id.  See also Sleekcraft*, 599 F.2d at 349.

The fourth category of marks is referred to as "descriptive."  *Kendall-Jackson Winery*, 150 F.3d at 1047.  An example of a descriptive mark is "Honey Roasted" for nuts roasted with honey.  *Id*.  Because these marks merely describe a characteristic of the product, they do not receive any trademark protection unless they acquire sufficient "secondary meaning" to create an association between the mark and the product.  *Id*.

The Ninth Circuit has generally applied one or two tests to differentiate between suggestive and merely descriptive marks.  The most widely used test is the "imagination test," which asks whether "imagination or a mental leap is required in order to reach a conclusion as to the nature of the product being referenced."  *Rudolph Int'l, Inc. v. Realys, Inc*., 482 F.3d 1195, 1198 (9th Cir. 2007).[6]  The second test, the "competitors' needs" test, "focuses on the extent to which a mark is actually needed by competitors to identify their goods or services."  *Rodeo Collection, Ltd. V. W. Seventh*, 812 F.2d 1215, 1218 (9th Cir. 1987).  If competitors have a great need to use a mark, the mark is probably descriptive; on the other hand, if "the suggestion made by the mark is so remote and subtle that it is really not likely to be needed by competitive sellers to describe their goods or services[,] this tends to indicate that the mark is merely suggestive."  *Id.*  This test is related to the imagination test, "because the more imagination that is required to associate a mark with a product or service, the less likely the words used will be needed by competitors to describe their products or services."  *Id.*

---

[6] For example, the mark "ENTREPRENEUR" as applied to a magazine was descriptive, and not suggestive, because it directly described the quality or features of the product and "an entirely unimaginative, literal-minded person would understand the significance of the reference."  *Entrepreneur Media, Inc.*, 279 F.3d at 1142.

The final category of marks consists of "generic" marks, which describe the product in its entirety, and which are not entitled to trademark protection.  *Id*.  Examples include "Liquid controls" for equipment that dispenses liquid, or "Multistate Bar Examination" for a bar examination that may be taken across multiple states.  *Id*.; *see also Nat'l Conf. of Bar Examiners v. Multistate Legal Stud., Inc.*, 692 F.2d 478, 488 (7th Cir. 1983).

Identifying whether a mark is arbitrary, fanciful, suggestive, descriptive, or generic, however, is only the first step of the inquiry.  The second step is to determine the strength of the mark in the marketplace, i.e., the commercial strength of the mark.  *One Industries, LLC v. Jim O'Neal Dist., Inc*., 578 F.3d 1154, 1164 (9th Cir. 2009).  "When similar marks permeate the marketplace, the strength of the mark decreases.  In a crowded field of similar marks, each member of the crowd is relatively weak in its ability to prevent use by others in the crowd." *Id*. (internal quotation marks omitted).

### a.    The FLIPBOARD Marks are Suggestive

Flipboard argues that the FLIPBOARD marks are strong. Dkt. 61 at 23.[7]  First, Flipboard argues that because the USPTO registered the FLIPBOARD marks without requiring proof of secondary meaning, it created a presumption that the marks are inherently distinctive. *Id*. (citing *Zobmondo Entm't, LLC v. Falls Media, LLC*, 602 F.3d 1108, 1113-15 (9th Cir. 2010) (holding that "[w]here the PTO issues a registration without requiring proof of secondary meaning, the presumption is that the mark is inherently distinctive" and the burden shifts to the junior mark holder to show that the mark is "merely descriptive" by a preponderance of the evidence)).  Second, Flipboard argues that even if there was no

---

[7] The parties stipulated in the Pretrial Order that the briefs submitted in connection with the parties' cross-motions for summary judgment would serve as their trial briefs in this matter. Dkt. 84 at 18.  *See also* Dkt. 51 (Treemo's Motion for Summary Judgment); Dkt. 61 (Flipboard's Motion for Summary Judgment).

presumption, it is clear that its marks are at most "only lightly suggestive" because "the FLIP portion of the mark ties in to the way that users flip through content in the application, but beyond that the mark does not describe the application." *Id.*  Flipboard contends that its "F" Logo is similarly suggestive, as "the use of an acronym or initial representing an underlying suggestive word mark is in and of itself non-descriptive, and here the Flipboard F logo is made further distinct by the stylized way in which its 'F' shape is composed of rectangles of differing opacity." *Id.*  Finally, Flipboard argues that its marks are commercially strong because the Flipboard app is enormously popular, with over 130 million total installations of the app and over 400,000 new users per day. *Id.*  In addition, it has been covered by most major media publication in the United States and is widely known in the industry. *Id.*

Treemo argues that both Treemo and Flipboard's marks are weak and entitled to only narrow protection.  First, Treemo argues that FLIPBOARD is at best "suggestive," because it evokes the notion of "flipping pages on a board."  Dkt. 51 at 12.  Second, Treemo argues that the FLIPBOARD mark has acquired little commercial strength, because it has only been in use for roughly four years.  *Id.* at 13.  Additionally, Treemo argues that there are hundreds of live marks used by other companies that are equally – or more similar – to the FLIPBOARD mark than the FLOWBOARD mark.  *Id.* at 13-14.  Finally, Treemo argues that its own FLOWBOARD mark is equally weak, and was chosen precisely because it evoked the essence of Treemo's product: "a union of a FLOWchart with a storyBOARD."  *Id.* at 14.  Thus, Treemo argues that the FLIPBOARD mark is entitled to little protection, and acknowledges that the FLOWBOARD mark is unlikely to overtake Flipboard's senior mark in the market.  *Id.* at 15.

The Court agrees with Flipboard that although the FLIPBOARD marks do not rise to the level of "arbitrary" or "fanciful" marks, which are afforded the highest levels of protection, they are "suggestive" rather than "merely descriptive."  The term "FLIP" in the FLIPBOARD mark describes the way that users can use their fingers to "flip" through content in the application, but otherwise the mark does not literally describe the application.  In other words, some imagination and "a mental leap" is required to understand the mark's relationship to the product.  *Rudolph Int'l.*, 482 F.3d at 1198.  The use of an "F" logo composed of rectangles to represent the underlying FLIPBOARD mark is also non-descriptive.

The competitors' needs test also strongly favors Flipboard's argument that its mark is suggestive.  Ms. McCue testified that Flipboard itself considered hundreds of names to describe its product, including "Highlight," "Gravity," and "Floe."  Similarly, Mr. Brookler testified that his team held a series of meetings before deciding on the FLOWBOARD mark.  Accordingly, both the imagination test and the competitors' needs test favor Flipboard's argument that its marks are "suggestive," and therefore entitled to some degree of protection.

b.      The FLIPBOARD Marks are Commercially Strong

Evidence adduced at trial overwhelmingly establishes that the FLIPBOARD marks are commercially strong.  Over 130 million people have used the Flipboard app, and 200,000 to 300,000 new users are added every day.  Moreover, Flipboard earns millions of dollars from the Flipboard app.  *See also Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1179 (9th Cir. 1988) ("Evidence of strength of [plaintiff's] mark includes . . . sales in excess of one billion dollars."); *Coach, Inc. v. Siskiyou Buckle Co., Inc.*, No. C11-486-HZ, 2012 WL 1532489 at *4 (D. Or. Apr. 27, 2012) (holding that the fact that a mark earns millions of dollars annually shows commercial strength).  Finally, as discussed above, the Flipboard app

MEMORANDUM OPINION - 16

has garnered numerous awards and received extensive attention from the press, including such publications and websites as CNN, ESPN, the *New York Times*, *People*, *Esquire*, *Time*, *Forbes*, *Fortune*, *Cosmopolitan*, and *Bon Appétit*.  In comparison, Treemo has not shown that its mark is equally strong or that it has the potential to overtake Flipboard's mark in the marketplace.  In fact, Treemo concedes that its mark is relatively weak.  Dkt. 51 at 14-15.

Moreover, Treemo's argument that Flipboard's marks are weakened by the virtue of the "numerous other companies using other marks which are equally as or more similar to the Flipboard mark as Treemo's mark," is inapposite.  Many of the marks Treemo points to are used in unrelated industries or relate to dissimilar products, and therefore does not diminish the strength of Flipboard's marks.  *See e.g.*, *Eclipse Assoc. Ltd. v. Data Gen Corp.*, 894 F.2d 1114, 1119 (9th Cir. 1990) (upholding a trial court's exclusion of evidence related to third-party use of marks in unrelated industries); *Du Barry of Hollywood, Inc. v. Richard Hudnut*, 323 F.2d 986, 988 (9th Cir. 1963) ("The fact that goods and services unrelated to this class of products have, on occasion, been offered for sale to the public under the name 'Du Barry' does not diminish the strength of Hudnut's mark in its own field of cosmetics, toiletries and related articles for women.").[8]

Accordingly, the Court finds that the FLIPBOARD marks are "suggestive," and also commercially strong in the marketplace.  The first *Sleekcraft* factor therefore weighs in favor of Flipboard, and finding a likelihood of confusion.

---

[8] Treemo argues that the Feedly app, which is a news aggregator, has a stylized "F" logo that resembles Flipboard's "F" logo.  Treemo further contends that the existence of the Feedly app in the marketplace suggests that the FLIPBOARD marks are weak.  But in light of the fact that the Court finds no likelihood of confusion with respect to the "F" logos at issue in this action, it is unnecessary to reach a conclusion regarding the impact of the Feedly stylized logo on the strength of Flipboard "F" logo trademark.

MEMORANDUM OPINION - 17

2.      Similarity of the Parties' Goods

The similarity of the parties' products is "relevant to the confusion analysis in that for related goods, the danger presented is that the public will mistakenly assume there is an association between the producers of the related goods, though no such association exists.  The more likely the public is to make such an association, the less similarity in the marks is requisite to a finding of likelihood of confusion." *Sleekcraft,* 599 F.2d at 350.  The public is likely to make such an association when the goods are complementary, products are sold to the same class of purchasers, or the goods are similar in use and function.  *See id.  See also Brookfield Commc'n*, 174 F.3d at 1056 ("[T]he relatedness of each company's prime directive isn't relevant.  Instead the focus is on whether the consuming public is likely somehow to associate West Coast's products with Brookfield.") (internal citation omitted); *Golden Door, Inc. v. Odisho*, 646 F.2d 347, 350 (9th Cir. 1980) ("[T]here is sufficient similarity in the general nature of the two businesses to support the district court's finding.").

Treemo argues that its Flowboard app is not similar to the Flipboard app.  Dkt. 51 at 15-17.  First, Treemo argues that the parties' products and services are unrelated and function differently, because Treemo's Flowboard app functions in the area of "touch publishing" and "content creation," whereas Flipboard's app is a "news aggregator" and does not allow for the creation of new content or foster any form of creativity.  Dkt. 51 at 15-16.  Treemo argues, "[s]imply put, the Flipboard Product does not allow for anything except reading an 'electronic magazine.'"  *Id*. at 16.  Second, Treemo argues that the parties target different customers because the Flowboard app is "targeted to creative individuals who, generally, are authoring presentations or other business-minded content," whereas the Flipboard app is "targeted at individuals who enjoy reading the news."  *Id*.  Finally, Treemo argues that the parties "use

MEMORANDUM OPINION - 18

different marketing channels" because the Flowboard app is categorized as a "productivity" app in the Apple App Store, and the Flipboard app is categorized as a "news" app. *Id.*

Flipboard takes a broader view of the parties' products. Specifically, Flipboard argues that both products' "primary function is to allow users to create and share personal, customized publications that combine text and images drawn from a variety of sources." Dkt. 61 at 26. Moreover, Flipboard argues that "both [products] can be used to tell stories, initiate dialog about new ideas, and share photos in an aesthetically pleasing format." *Id.* During trial, Ms. McCue and Ms. Mak testified that both the Flipboard and Flowboard apps are part of the personalized publication app market, and could be used to prepare extremely similar publications.

Contrary to Treemo's arguments, the Court finds that consumers are likely to make an association between Flipboard and Flowboard, based upon the fact that both apps are sold in the same manner (via the Apple app store) to the same class of purchasers and are quite similar in use and function. *See Sleekcraft*, 599 F.2d at 350. As a threshold matter, Treemo's contention that the Flipboard app is a "news aggregator" and "does not allow for the creation of new content or foster any form of creativity" or "anything except reading an 'electronic magazine'" may have been an accurate characterization of Flipboard 1.0. It is not, however, an accurate characterization of Flipboard 2.0. As discussed in detail above, Flipboard 2.0 substantially expanded the functionality of the product by allowing users to create their own personal and interactive publications called "magazines" by combining online content from various Internet sources in order to tell stories, create an online photo album, or display social media content. *See* Ex. 100 (Mossberg YouTube video demonstrating Flipboard 2.0's

functions).  This ability to create content and use the app as a means of creative expression is also a defining feature of the Flowboard app.

During the trial, Ms. McCue explained that the content available on Flipboard 1.0 was collected by Flipboard employees who were finding great stories across the web or social networks.  However, Flipboard 2.0 allowed users to collect stories and create content on their own and share it in their own magazine or presentation package to express themselves, share ideas, or tell stories.  Ms. McCue testified that thousands of these magazines, created for a myriad of purposes, are published and shared by Flipboard users every day.  *See e.g.*, Ex. 111 ("Rice University Official Flipboard"); Ex. 112 ("Mobile Trucking Magazine: Trucking Industry News & Information for Drivers"); Ex. 113 (journalist's writing portfolio); Ex. 114 (user's art and design portfolio).  For example, archaeologists have created Flipboard magazines containing photographs and stories of archaeological digs and finds happening around the world.  Educators have used Flipboard to share lesson plans and ideas.  Real estate agents and small businesses have used Flipboard to collect stories and share news about their local market.  Finally, it is common for Flipboard users to create magazines with pictures or videos from places they have visited, or destinations they hope to visit in the future.  *See* Ex. 115 (Flipboard presentation of Ms. McCue's recent trip to Africa).  Accordingly, like Flowboard, Flipboard 2.0 also allows for creativity and content creation by users in the touch publishing market.

Treemo argued at trial that the Flowboard app occupies a different category than the Flipboard app in the principal marketplace, i.e, the Apple app store, because Flowboard was categorized as a "productivity" app and Flipboard was categorized as a "news" app.  *See* Ex. 504 ("Flowboard: Presentation App with Touch Publishing" in the Apple app store under the

"Productivity" category); Ex. 505 ("Flipboard: Your Social News Magazine" in Apple app store under the "News" category); Ex. 506 ("Flipboard: Your News Magazine" in the Google Play Store under the "News & Magazines" category); Ex. 507 (Flowboard's Mac App Store Description); Ex. 519 (Flowboard's 2014 "Tabby Award" for Best Personal Productivity App). Treemo contends that the app store categorizations reflect the fact that Flowboard is "presentation" software, like Microsoft PowerPoint, and the Flipboard app principally remains a news aggregation app.

The Court finds that the app store categorization of these two apps is a distinction without a difference. Substantial testimony at trial established that companies are only allowed to select one category for their app in the Apple store, and the fact that Flipboard selected the "news" category as a more advantageous category when it first released Flipboard 1.0 does not in and of itself prove anything about the two apps' similarities or differences with respect to their current functionality or purpose. In fact, Ms. McCue testified that app categorization has little influence on how apps are purchased by consumers, as most users will shop the app store by using the search bar rather than scrolling through hundreds of apps by category.

The Court is also not convinced that Treemo fairly categorizes Flowboard as merely "presentation" software. This claim is undermined by evidence that Treemo's own executives repeatedly compared the Flowboard app to the "new" Flipboard app in press solicitations and, in fact, indicated that both Flipboard and Flowboard products were competing in the same category or space. On several occasions Treemo CEO Mr. Brookler went so far as to say that "while our[] [app] could also be used as a PowerPoint substitute, we are really going after the consumer category." Ex. 44; *see also* Exs. 32, 42 (indicating same).

MEMORANDUM OPINION - 21

For example, in an April 12, 2013 press solicitation email to Matt Marshall of Venture Beat, Mr. Bookler stated:

> Flowboard falls into a new category of apps in the "touch publishing" space, which can be defined as using the tablet to create a better way to tell and share stories, create presentation, scrapbooks, memories and photo/video collections. *Other companies in the category include Flipboard*, Haiku, KeepShot, and Prezi.

Ex. 34 (emphasis added). *See also* Exs. 33-41, 43, 45 (indicating same). Additionally, in an April 5, 2013 email to Jay Greene of CBS Interactive, Mr. Brookler stated:

> Our new product falls into the "touch publishing" space, which generally can be defined as using the tablet to create a better way to tell and share stories, create scrapbooks, memories and photo/video collections. *While our app could also be used as a PowerPoint substitute, we are going after the consumer category first. Other similar launches in the space include* Haiku Deck, another local company that is enterprise-focused, and *Flipboard's new product* – so we know we are really onto something.

Ex. 32 (emphasis added).

Although Treemo's demonstration of the Flowboard app at trial showed how the user's experience of using the two apps to create content is different, the primary function of both the Flipboard and Flowboard apps is to allow users to create and share personal, customized publications and/or presentations that combine text and images. In addition, although the Flowboard app allows users to create content directly from within the Flowboard app without an Internet connection, which the Flipboard app cannot do, the end result of both products is substantially the same. The "magazines" created by Flipboard users can serve the same purpose and are strikingly similar to "presentations" created by Flowboard app users. *Compare* Ex. 10 ("Castles of Japan" created using Flowboard app) *with* Ex. 2 ("Castles in Wales" created using Flipboard app); Ex. 11 ("Classic Hikes of N. America" created using Flowboard app) *with* Ex. 3 ("Bay Area Hikes" created using Flipboard app); Ex. 15 ("10

MEMORANDUM OPINION - 22

Places a Person Should Visit Before they Die" created using Flowboard app) *with* Ex. 7 ("Bucket List: Got to See, Got to Do, Before I Kick the Bucket" created using Flipboard app); Ex. 16 ("Press Play to Start: Integrating Games-Based Learning Into Your Classroom" created using Flowboard app) *with* Ex. 8 ("Classroom Technology" created using the Flipboard app).

Accordingly, although Treemo argued at trial that its product should be characterized as "presentation" software, and was therefore not competing in the same category as Flipboard 2.0, consumers can and do create extremely similar publications using both apps.  Thus, the two apps are similar in functionality, and are being sold to the same class of consumers within the same industry.  Users are therefore likely to make an association between the goods.  *See Sleekcraft,* 599 F.2d at 350.  This *Sleekcraft* factor weighs in favor of Flipboard, and a finding of a likelihood of confusion.

3.     Similarity of the Parties' Marks

The Ninth Circuit has "developed certain detailed axioms to guide [the] comparison" of the parties' marks.  *GoTo.com, Inc. v. Walt Disney, Co*., 202 F.3d 1199, 1206 (9th Cir. 2000). First, the marks must be considered in their entirety and as they appear in the marketplace.  *Id.* Second, the similarity of competing marks "is tested on three levels: sight, sound, and meaning."  *Sleekcraft*, 599 F.2d at 351.  Third, similarities are weighed more heavily than differences.  *Id.*

The parties' respective marks, as they appear in the marketplace, are shown below:

With respect to sight, sound, and meaning, the word marks are extremely similar.  Both marks consist of nine letters, beginning with the letters "FL" and ending with the suffix "BOARD."  Both marks are compound words.  The only difference between the two marks is that the "IP" in FLIPBOARD is replaced by "OW" in FLOWBOARD.[9]  Indeed, both Mr. Brookler and Geoff Entress, a Treemo director, have acknowledged the striking similarities between the two word marks.  In an email to Mr. Brookler about the FLOWBOARD mark, Mr. Entress stated, "I'm not an expert on branding, but I like it.  Is the popular news app Flipboard?  I guess that is a good thing."  Ex. 26.[10]  Moreover, Mr. Brookler acknowledged that "[w]e have a special sensitivity to 'flipboard' beyond others as our names are close" in an April 17, 2013 email to Tina Qunell of RUBII Media, who was ultimately engaged as Treemo's public relations consultant although she had recently mixed up the names Flipboard and Flowboard in a draft press release she had provided for Mr. Brookler's review.  Ex. 29.

With respect to the meaning of the marks, both parties testified that the word marks have no independent meaning apart from attempting to describe the experience of using their

---

[9] Flipboard's head of design, Marcos Weskamp, testified that when people read they tend to perceive shapes rather than read letter-by-letter.  As a result, the similarities between the shapes of the words "FLIPBOARD" and "FLOWBOARD" is likely to cause people to read one mark even though the other appears.

[10] The Court does not credit Mr. Entress' testimony that he was suggesting "it was a good thing" that Flipboard was a popular news reader because it could not be easily confused with the Flowboard app.  Regardless, even if true, it is evident that Mr. Entress immediately noticed the similarity between the two word marks.  *See* Ex. 26.

MEMORANDUM OPINION - 24

apps.  For example, Ms. McCue testified that the FLIPBOARD mark was selected because the user can "flip" through content like you flip pages of a magazine.  Similarly, Mr. Brookler testified that the FLOWBOARD mark was selected because the user can "flow" from screen to screen within the app from the table of contents page.  The Court is unimpressed by the distinction between "flipping" and "flowing" through content.  As Ms. Qunell observed during her deposition:

> With the names itself, I think it could be very confusing, especially if they didn't have experience with either one . . . whether you flip or you flow in between – between boards – I mean, just from a very literal perspective . . . it would be very hard to distinguish, in literal terms, between the two.

Qunell Dep. at 37:13-38:5.  Accordingly, the Court finds the word marks substantially similar in sight, sound, and meaning, and considers it likely that consumers would confuse the two.

The Court does not, however, find Flipboard and Flowboard's respective "F" logos to be confusingly similar nor likely, by themselves, to cause confusion.  Although both logos feature an upper-case "F" comprised of rectangles/squares with sharp edges, this is where the similarities between the logos end.  The design and color schemes are entirely different.  Treemo considered numerous proposed designs for its "F" logo.  Exs. 79-82, 86, 91.  Mr. Brookler testified that he ultimately settled on a blue capital letter "F" comprised of three rectangles of equal length on a solid (generally white) background because it was the most illustrative of the Flowboard app.  Ex. 17.[11]  Specifically, Mr. Brookler explained that instead of tapping on a button to insert text or video, a Flowboard app user creates a block shape and then fills that block with content.

---

[11] The logo for Flowboard's education specific product is comprised of a vertical pencil (as the back of the "F"), with two horizontal blue rectangles.  Ex. 120.  It bears no resemblance to Flipboard's "F" logo.

By contrast, Flipboard's "F" logo is described, in its trademark registration, as follows: "the mark consists of a red square containing a stylized letter "F", which is composed of a white vertical rectangle, with a pink bar creating the upper bar of the letter "F", and with a pink square below it, creating the middle bar of the letter "F". Ex. 523. Flipboard's "F" also has a stairstep design and the appearance of translucency, rather than two solid-colored horizontal rectangles of equal length. Flipboard's head of design, Marcos Weskamp, testified that although Flipboard normally uses a red color as the background for the logo, in conception Flipboard has always imagined the "F" to be a translucent element that could be placed against any other color. He further testified that the Flipboard logo represents the layout of the magazine and the different types of content on a page. By themselves, the two "F" logo marks are neither substantially similar, nor likely to cause confusion in the marketplace.

### 4.   Degree of Actual Confusion

To constitute trademark infringement, use of a mark must be likely to confuse an appreciable number of people as to the source of the product. *See Entrepreneur Media,* 279 F.3d at 1151 (citing *Int'l Ass'n. of Machinists and Aerospace Workers v. Winship Green Nursing Ctr.*, 103 F.3d 196, 201 (1st Cir. 1996) ("[T]he law has long demanded a showing that the allegedly infringing conduct carries with it a likelihood of confounding an appreciable number of reasonably prudent purchasers exercising ordinary care."))). However, actual confusion is hard to prove, and therefore the absence of such evidence is generally not noteworthy. *See Brookfield Comm'cn*, 174 F.3d at 1050. Where it exists, however, evidence of actual confusion as to the source of a product is "persuasive proof that future confusion is likely." *Sleekcraft*, 599 F.2d at 352.

Treemo contends that Flipboard fails to present any evidence of actual confusion in the minds of consumers as to their purchasing decision. Dkt. 67 at 4. Rather, Treemo argues that Flipboard has only shown confusion by Treemo's investors, public relations consultant, a close friend of Brent Brookler, and Treemo's counsel – "casual mistakes in informal communication by people who are *least* confused about the source of Treemo's services." *Id*. at 5 (emphasis in original). Treemo asserts that "[a]ll Flipboard has identified are examples of careless drafting by people who, admittedly, should know better. But careless slips do not constitute actual confusion as to source." *Id.* Treemo's arguments, however, are not supported by the evidence presented at trial.

Flipboard produced evidence of numerous instances of actual confusion between the two word marks by consumers. Perhaps most striking are email inquiries sent from Flowboard users by clicking a link within the Flowboard app to provide feedback to support@flowboard.com, who mistakenly referred to the app or company as Flipboard. For example, on July 3, 2013, a Flowboard user commented that "This is a great app! However, it will be difficult for all my clients to have an iPad to read from Flipboard. It will be great if I can download my Presentations & send it to my Clients. Either in PDF or PPT." Ex. 52. Similarly, on January 27, 2014, a Flowboard user stated that "I used Flowboard a time ago – your CEO even showed my first try-out Flipboard in a video interview he did." Ex. 53. An email to support@flowboard.com dated April 22, 2013 stated, "Hello Flipboard Team! I absolutely love your app. As a business owner I am able to put together creative briefs and presentations." Ex. 54. On May 30, 2013, an email inquiry sent directly to Mr. Brookler referred to the app as Flowboard at first, but later commented that "it would be cool to be able to actually embed the Flipboard on other websites as opposed to just linking it," and asked

whether it was "possible to put links directly in the Flipboard so people can just click on my address etc?"  Ex. 55.

The record is also replete with instances of individuals referring to Flowboard as Flipboard, even when they were presumably aware of the difference between the two companies.  For example, Mr. Brookler received an email from an investor, Philip Osman, on July 1, 2013, in which Ms. Osman stated, "it is great to hear such positive news from Treemo/FlipBoard."  Ex. 51.  As mentioned above, Treemo's own public relations consultant Ms. Qunell testified that she has confused the names Flowboard and Flipboard based upon the similarities between the two word marks.  Specifically, Ms. Qunell drafted a press release for Mr. Brookler on April 17, 2013, in which she unintentionally referred to Treemo/Flowboard as Flipboard throughout the two-page document, and even titled the document "Flipboard Draft Release."  Exs. 47-48.  Ms. Qunell testified that this error occurred because she prepared the draft between 4:30-5:30 a.m., she was a daily user of the Flipboard app at the time, and the FLOWBOARD and FLIPBOARD marks are similar.  When he received her email, Mr. Brookler pointed out Ms. Qunell's error, and explained, "We have a special sensitivity to 'flipboard' beyond others as our names are close."  Ex. 29.

When she was asked about her error in her deposition, Ms. Qunell testified, "Brent had mentioned that there was some – some confusion.  I had – I had made the mistake of, even in documents – and as you can tell today – 'Flipboard,' 'Flowboard.'  Just sometimes things roll off the tongue.  And he had mentioned that while he – he understood why on accident I was just getting the words confused.  But that – you know, it was a sensitive subject for him."  Qunell Dep. at 35:10-18.  In addition, she opined that the two names "could be very confusing, especially if [someone] didn't have experience between either one . . . at least in my mind,

MEMORANDUM OPINION - 28

whether you flip or you flow in between – between boards – I mean, just from a very literal perspective . . . it would be hard to distinguish, in literal terms, between the two." *Id.* at 37:15-38:5.

Media coverage of the Flowboard app has also frequently linked Treemo/Flowboard to Flipboard, based upon the similarity of their marks. For example, an article on the Texas Wesleyan University website titled, "App of the Week – Flowboard" was "tagged" with the word FLIPBOARD, signaling some kind of connection between the two apps. Ex. 57. Similarly, a blog called Learningtechnologies.blogcommunity.com posted an article, "FREE Alternatives to Powerpoint, Part 2," which discusses Flowboard, but was nevertheless "tagged" with the word FLIPBOARD. Ex. 58. In addition, a reader comment dated July 14, 2013, responding to an article by Tech Crunch about this lawsuit, stated, "[a]s a creative thinker who has a few names under his belt, when I first heard of Flowboard, I thought it was a spin off product from the company behind Flipboard that I have on my iPad." Ex. 56.

Flipboard provided evidence that postings on social media, such as Facebook, have also associated the two apps based entirely upon the similarity between their marks. For example, an individual named Rachael LaFave Turner posted a link to a Flowboard presentation on Facebook on December 26, 2013, but titled it "Flipboard link." Ex. 61. Similarly, a Flowboard user described her Flowboard as follows: "This flipboard is about the bands that saved my life…If you have any requests for a flipboard of a band, e-mail me at SaraHasNoLife@yahoo.com." Ex. 104. *See also* Ex. 99 (video about Flowboard IOS app in which the narrator refers to the Flowboard app as Flipboard). Moreover, a personal friend of Mr. Brooker, Claire Joanna, asked him via Facebook post on June 27, 2013, if the Flowboard app was "the same as Flipboard?" Ex. 50. When he was asked about Ms. Joanna's question

during his deposition, Mr. Brookler acknowledged, "I would have to say she's uncertain . . .

Appears she's confused."  Brookler Dep. at 118:6-9.

Finally, Flipboard's general counsel Ms. Mak testified that when she ran Google

searches with the search terms "flowboard app" and "flowboard application," Google provided

several suggested search items that all exclusively referenced the Flipboard app.  Exs. 105-106.

Google also exclusively showed results for the Flipboard app, rather than the Flowboard app.

This evidence suggests that consumers who are attempting to search for Flowboard using

Google would instead be redirected to websites referencing Flipboard.

"Initial interest confusion" occurs when customers seek the holder of the trademark but

are instead directed to the alleged infringer.  While the customers may be only initially

confused as to the identity of the trademark holder and may voluntarily continue to instead

pursue the alleged infringer, the alleged infringer is said to have benefitted from goodwill

developed by the holder of the trademark, which generated the customer's initial interest.  *See*

*Brookfield,* 174 F.3d at 1062 (providing that "initial interest confusion" may still be an

infringement even if no sale is consummated as a result of the confusion).  *See also Dr. Seuss*

*Enters., L.P. v. Penguin Books USA, Inc.,* 109 F.3d 1394, 1405 (9th Cir. 1997).

Here, however, Flipboard does not argue that the Google search results would cause

initial interest confusion, i.e., a "bait and switch" for Flipboard's potential customers.  In fact,

the Google search results suggest that potential Flowboard customers would instead be re-

directed by Google to Flipboard's site.  Nevertheless, the Google search results continue to link

Flowboard with Flipboard, fostering consumer confusion about the difference between the two

apps, and showing that the two apps operate within the same space.

Accordingly, Flipboard has presented evidence of actual confusion by Flowboard users who were mistakenly affiliating the app with Flipboard, as well as instances of confusion in informal communications by people who are or should be aware of the difference between the two apps.  Flipboard has also shown that consumers who conduct Google searches for the words "Flowboard app" or "Flowboard application" may be further confused by suggested search terms and results that solely reference Flipboard.  As evidence of actual confusion is persuasive evidence that future confusion is likely, this *Sleekcraft* factor strongly weighs in favor of Flipboard.  *See Sleekcraft*, 599 F.2d at 352.

5.      Marketing Channels

"Convergent marketing channels increase the likelihood of confusion."  *Sleekcraft*, 599 F.2d at 353.  Both parties' use of the Internet as a marketing tool is "a factor that courts have consistently recognized as exacerbating the likelihood of confusion."  *Brookfield*, 174 F.3d at 1057.  "*Some* use of the Internet for marking, however, does not alone and as a matter of law constitute overlapping marketing channels."  *Entrepreneur Media, Inc.*, 279 F.3d at 1151 (emphasis in original).  "The proper inquiries are whether both parties use the Web as a substantial marketing and advertising channel, whether the parties' marks are utilized in conjunction with Web-based products, and whether the parties' marketing channels overlap in any other way."  *Id.* (internal quotations and citations omitted).

Flipboard argues that the marketing channels for the Flipboard and Flowboard products are identical.  Dkt. 61 at 27-28.  Specifically, Flipboard points out that both applications are marketed through social media, blogs, online magazines, and online ads.  *Id.* at 28.  Moreover, Flipboard points out that both companies use the same Internet app stores to distribute their products and that the products are downloaded the same way.  *Id.* at 27.  Flipboard also

contends that the fact that the products are categorized differently in the app stores is irrelevant, because "it is far more likely that consumers search for the names of the application or click on links in news articles to the applications' pages" within the application stores, neither of which implicates the application's sub-categorization. *Id*.

While acknowledging that both parties use the Internet to market their products, Treemo argues that the parties use different marketing channels. As discussed above, the Flowboard app is categorized as a "productivity" application by the Apple App Store, whereas Flipboard's app is consistently categorized as a "news" application. Dkt. 51 at 16-17. Treemo argues the difference in categorization shows that the apps utilize differing marketing channels, because "individuals seeking productivity application are not likely to be browsing news-readers." *Id.* at 16.

It is generally true that, without more, marketing using the Internet is insufficient to establish overlapping channels. In this case, however, both parties use the Internet as their primary marketing and advertising channel, both parties' marks are utilized in conjunction with their Web-based products, and both parties exclusively sell their products in the same app stores. As mentioned above, Ms. McCue testified at trial that the difference between the apps categorization in the app store does not have a significant impact on the way in which consumers find the apps because consumers most often type the name of an application into the search bar, rather than scrolling through hundreds of apps sorted by category.[12] Flowboard did not introduce any testimony to the contrary. As a result, confusion between the FLOWBOARD and FLIPBOARD marks could easily result in a consumer searching for and

---

[12] For example, Ms. McCue testified that whenever Flipboard has received a lot of press attention, the company sees a boost in sales due to consumers searching for and purchasing the app. Alternatively, Ms. McCue testified that whenever Flipboard has been a "featured app" on the first page of the app store, they have seen a dramatic boost in app sales as a result of the heightened visibility.

then downloading the wrong app, regardless of whether the apps are categorized as "news" or "productivity" apps.  Thus, this factor weighs in favor of Flipboard.

### 6.   Degree of Care Exercised by Purchasers

"Low consumer care . . . increases the likelihood of confusion."  *Playboy Enter., Inc. v. Netscape Commc'n Corp.*, 354 F.3d 1020, 1028 (9th Cir. 2004).  "In assessing the likelihood of confusion to the public, the standard used by the courts is the typical buyer exercising ordinary caution . . . . [W]hen the goods are expensive, the buyer can be expected to exercise greater care in his purchases[.]"  *Sleekcraft*, 599 F.2d at 353 (citations omitted).  Conversely, "[c]onsumer care for inexpensive products is expected to be quite low.  Low consumer care, in turn, increases the likelihood of confusion." *Playboy*, 354 F.3d at 1028.

Here, both products are available for download for free.  Moreover, testimony at trial unequivocally established that the time and effort to download and install the applications are minimal.  With an Internet connection, both apps can be downloaded with the touch of a finger within thirty seconds to one minute.  While Treemo argues in its brief that its target audience is more sophisticated consumers who use technology applications as a matter of course, Treemo did not introduce any evidence at trial to support this assertion.  In light of the ease with which both applications can be downloaded for free, it is unlikely that consumers are likely to exercise much care when downloading them.[13]  Thus, this factor weighs in favor of Flipboard and in favor of a finding of a likelihood of confusion.

---

[13] This finding is not altered by the fact that Treemo offers a "premium" version of its Flowboard application that provides consumers with access to extra features.  Mr. Brookler testified that consumers can purchase Treemo's premium app for $4.99 a month or $39.99 a year.  However, the premium version of the Flowboard app has only been downloaded 6,000 times, whereas the free iPad app has been downloaded almost 300,000 times.

7.      Treemo's Intent in Selecting the FLOWBOARD Marks

"[I]ntent to deceive is strong evidence of a likelihood of confusion." *Entrepreneur Media,* 279 F.3d at 1148 (internal quotation marks omitted). "When the alleged infringer knowingly adopts a mark similar to another's, reviewing courts presume that the defendant can accomplish his purpose: that is, that the public will be deceived." *Id.* (internal quotation marks omitted). "This factor favors the plaintiff where the alleged infringer adopted his mark with knowledge, actual or constructive, that it was another's trademark." *Brookfield,* 174 F.3d at 1059.

Flipboard argues that Treemo acted in bad faith and attempted to trade on Flipboard's established goodwill when it chose the FLOWBOARD mark, and points to several pieces of evidence to support its position. Dkt. 61 at 21. First, Flipboard points to the July 27, 2012 email from Geoff Entress, a Treemo director, to Mr. Brookler in which he states, "I like [the name Flowboard]. Is the popular news app Flipboard? I guess that is a good thing." Ex. 26. Second, Flipboard points to statements made by Treemo likening the Flipboard App to the Flowboard App to press. Finally, prior to the launch of the Flowboard app, third parties repeatedly expressed to Treemo that the parties' names for their apps were similar, signaling a likelihood of confusion. Dkt. 61 at 22.

Treemo argues that, as Mr. Brooker testified, the FLOWBOARD mark was selected to embody the distinguishing characteristics of Treemo's Flowboard product, and not to unfairly capture Flipboard's goodwill. Dkt. 51 at 20. Moreover, Treemo argues that the examining attorney at the USPTO advised Treemo that there were no conflicting marks that would bar registration, thus validating its good faith belief that the FLOWBOARD mark could be used without creating consumer confusion. Dkt. 67 at 9-10.

It is undisputed that Mr. Brookler and Treemo were fully aware of the similarity between the FLOWBOARD mark and FLIPBOARD mark at the time the Flowboard app was launched on April 18, 2013.  Indeed, Mr. Brookler testified that he was familiar with the Flipboard app as early as 2010.  Regardless, however, the overall evidence does not show that Treemo adopted its marks in bad faith and with the intent to confuse consumers.

As mentioned above, Mr. Entress testified at trial that his statement, "I guess that is a good thing," meant that it was a good thing that Flipboard was a news app and not in Flowboard's space because otherwise the similarity in names would cause confusion. Although the Court was not wholly convinced by Mr. Entress' testimony, it is not material to intent because Mr. Entress' comment does not prove that Treemo intentionally selected the FLOWBOARD mark because of its similarity to the FLIPBOARD mark.  Indeed, further down the email chain, Mr. Entress stated that the FLOWBOARD mark "sounds good as long as no trademark issues."  Ex. 26.  Mr. Brookler assured Mr. Entress, "No trademark issues at all." *Id.*  Thus, the Court does not share Flipboard's view that this email exchange between Mr. Entress and Mr. Brookler constitutes a "smoking gun" that evinces intent to infringe on Flipboard's trademark.  On the contrary, this conversation can be interpreted as evidence that Mr. Brookler and Mr. Entress hoped to avoid a trademark dispute, which could be catastrophic to a small start-up like Treemo.  Mr. Brookler testified that especially after Treemo's recent lawsuit regarding Appafolio, he hoped the company would avoid a trademark dispute, which is why he sought trademark registration of the FLOWBOARD mark from the USPTO.

Perhaps most convincingly, Treemo only adopted its mark after being advised by the USPTO in July 2012 that the "trademark examining attorney has searched the USPTO's database of registered and pending marks and has found no conflicting marks that would bar

registration[.]"  Ex. 502.  The public opposition period closed before the Flowboard app

launched on April 18, 2013, without any opposition being filed.  Such evidence, coupled with

Mr. Brookler's testimony regarding the process by which the FLOWBOARD marks were

selected by Treemo, negates Flipboard's allegations of intent.  Accordingly, the evidence does

not support an inference that Treemo intended to confuse consumers by adopting the

FLOWBOARD marks, and this factor weighs in favor of Flowboard.

                8.      Expansion of Product Lines

        "Inasmuch as a trademark owner is afforded greater protection against competing

goods, a 'strong possibility' that either party may expand his business to compete with the

other will weigh in favor of finding that the present use is infringing.  When goods are closely

related, any expansion is likely to result in direct competition."  *Sleekcraft,* 599 F.2d at 354;

*see also M2 Software, Inc. v. Madacy Ent.,* 421 F.3d 1073, 1085 (9th Cir. 2005).  The court

must determine whether the allegedly infringing mark is "hindering the plaintiff's expansion

plans."  *Surfvivor Media,* 406 F.3d at 634.  A plaintiff must offer proof beyond mere

speculation or generalized expansion goals.  *See id.* (no concrete evidence of, only expressed

interest in, expansion tilted factor in favor of defendant); *Official Airline Guides v. Goss,* 6

F.3d 1385, 1394 (9th Cir. 1993) (the evidence of alleged intent to expand did not demonstrate

that the parties would "compete with a similar product in the same market").

        Where two companies are direct competitors, however, this factor is unimportant.  *See*

*Brookfield Commc'n*, 174 F.3d at 1060 ("The likelihood of expansion in product lines factor is

relatively unimportant where two companies already compete to a significant extent.").  In

such cases, the district court can decline to consider the likelihood of expansion.  *See Network*

*Automation, Inc. v. Advanced Systems Concepts, Inc*., 638 F.3d 1137, 1153 (9th Cir. 2011)

MEMORANDUM OPINION - 36

(holding that where two companies are direct competitors, the district court correctly declined to consider the likelihood of expansion).

Flipboard 2.0's current editor tools allow a user to adjust layouts, change the cover of the magazine, and add some written comments, but a user cannot upload original content directly off a phone or tablet right into the Flipboard app.  However, Flipboard's Head of Marketing Ms. McCue and General Counsel Cecily Mak testified that Flipboard will be releasing a new iteration of its app with a more expansive tool set in the next 60-90 days that will allow users to add original content right into the Flipboard app, as opposed to posting it somewhere else on the Internet first.  This new version of Flipboard will, of course, make Flipboard's content generation features even more similar to the Flowboard app.

As discussed above, however, the Court has already determined that Flipboard 2.0 and Flowboard are similar apps that compete for the same customers in the same space through the same marketing channels, and have similar functionality.  Because the Flipboard and Flowboard apps already compete directly, the Court need not consider whether the likelihood of expansion of product lines will further weigh in favor of finding that the present use is infringing. *See Brookfield Commc'n*, 174 F.3d at 1060.  Although it is unnecessary to address this factor, the Court finds that Ms. McCue and Ms. Mak's testimony at trial established a "strong possibility" that Flipboard will soon expand its features and even more closely resemble the Flowboard app.  Because the functionality of the two apps will continue to converge, keeping the two apps in direct competition with each other, the Court finds that this factor favors Flipboard.

9.    Balancing the *Sleekcraft* factors

As mentioned above, the relative import of each *Sleekcraft* factor is case-dependent. However, with the exception of the "intent" factor (which favors Treemo) as to the FLOWBOARD mark, the Court finds that the *Sleekcraft* factors overwhelmingly favor Flipboard's position and indicate a likelihood of confusion.  The Court finds no likelihood of confusion as to the competing "F" logo marks.

## VI.    PERMANENT INJUNCTION

The testimony by both parties was that confusion between the two would be highly detrimental.  Flipboard does not want consumers to believe its app is associated with Treemo or its products; Treemo does not want consumers to believe their Flowboard product is associated with Flipboard.  Nevertheless, confusion and likelihood of confusion as to the FLIPBOARD mark and FLOWBOARD mark exists and will continue if the infringement is not enjoined.

"[A] plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief.  A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."  *eBay Inc. v. MercExchange*, *LLC*, 547 U.S. 388, 391, 126 S. Ct. 1837, 164 L.Ed.2d 641 (2006).  *See also Herb Reed Enters, LLC v. Fla. Entm't Mgmt*., 736 F.3d 1239, 1249 (9th Cir. 2013) (holding that "the traditional four-factor test employed by courts of equity, including the requirement that the plaintiff must establish irreparable injury in seeking a permanent injunction" applies not only in the patent and

copyright context, but "the same principle applies to trademark infringement under the Lanham Act."). In addition, the Lanham Act expressly states that courts "have power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark...." 15 U.S.C. § 1116(a). Although neither party has briefed this issue, the Court considers each factor in turn in light of the evidence presented at trial and concludes that the four-factor test supports granting permanent injunctive relief to Flipboard.

As to the first factor, the Ninth Circuit has held that "actual irreparable harm must be demonstrated to obtain a permanent injunction in a trademark infringement action." *Herb Reed Enterprises, LLC*, 736 F.3d at 1249. Courts have recognized that in trademark cases, the irreparable harm may be shown through evidence of the loss of prospective customers, goodwill, or reputation. *See e.g., Stuhlbarg Intern. Sales Co., Inc. v. John D. Brush & Co., Inc.,* 240 F.3d 832, 841 (9th Cir. 2001). At trial, several witnesses for Flipboard expressed concern that Flipboard's reputation and goodwill were harmed by the confusion of consumers who mistakenly believed their Flowboard presentations were created using the Flipboard app. Ms. McCue and Mr. Weskamp also testified that Flipboard has invested substantial time and money in its specific design and aesthetic.

With respect to the second factor, the plaintiff must show that "remedies available at law, such as monetary damages, are inadequate to compensate for the injury." *eBay*, 547 U.S. at 391. Courts have broadly accepted the general proposition that, even after the Supreme Court's decision in *eBay*, monetary damages alone are inadequate to remedy trademark violations. Flipboard has sufficiently demonstrated that monetary damages are inadequate to

compensate for Treemo's infringement.  By filing this lawsuit, Treemo expressed its intention to continue infringing in the future if injunctive relief does not issue.

With respect to the third factor, the court must consider and balance the hardships that might afflict the parties following the grant or denial of the permanent injunction.  Although Treemo has not submitted any evidence regarding the hardship that would result from a permanent injunction requiring Treemo to cease its use of the FLOWBOARD mark and rebrand its app, as discussed below, the Court shall narrowly tailor the injunction by granting Treemo a fixed period of time to adopt a new mark and redirect traffic from its current website to a new URL.  In the absence of such an injunction, Flipboard's interests in maintaining control over its trademarks and avoiding injury to its reputation and goodwill will continue to be harmed by the confusion of consumers.

Finally, injunctive relief serves the public interest by protecting the rights of trademark holders against infringement and also minimizing consumer confusion.  *See Brookfield*, 174 F.3d at 1066 (noting that injunctive relief may be appropriate "to promote the public interest in protecting trademarks generally").   Thus, the four-factor test set forth in *eBay* supports granting permanent injunctive relief to Flipboard.

## VII.    CONCLUSION

The Court therefore ORDERS that Treemo and its agents or subsidiaries be permanently enjoined from using the FLOWBOARD mark or any other mark confusingly similar to the mark FLIPBOARD.  It is also ordered that a copy of this Order be provided by the parties to the USPTO, and that the FLOWBOARD trademark registration be canceled by the USPTO.  This injunction does not apply to Treemo's "F" logo.

This permanent injunction, however, will not take effect for sixty (60) days from the date of this Order so that Treemo may adopt a new word mark.  The use of FLOWBOARD in Treemo's URL will also be allowed to continue for six (6) months to permit Internet traffic intended for Treemo to be redirected to a new URL.  After the six month period, Treemo will cease using a URL that contains the mark FLOWBOARD or any confusingly similar URL.

The parties are directed to meet and confer and draft the terms of final injunctive relief and submit it to the Court within fourteen (14) days of this Order.  If they cannot reach agreement, separate proposals will be submitted and the Court will fashion the terms of the final permanent injunction.

The Clerk is directed to send a copy of this Order to counsel for both parties.

DATED this 15th day of October, 2014.

JAMES P. DONOHUE
United States Magistrate Judge

MEMORANDUM OPINION - 41